759 A.2d 1156

**Daeho Michael CHOI and Young Charles Choi**

v.

**STATE of Maryland.**

**Nos. 1874 and 1875, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

Sept. 28, 2000.

312

Cynthia E. Young, Annapolis, for appellants.

Mary Ann Ince, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Christian Jensen, State's Atty. for Caroline County, Denton, on the brief), for appellee.

Argued before KENNEY, ADKINS and JOHN J. BISHOP, Jr. (Retired, specially assigned), JJ.

JOHN J. BISHOP, Jr., Judge, Retired, Specially Assigned.

These consolidated appeals arise out of an altercation that occurred on July 10, 1998. Young Charles Choi and Daeho Michael Choi, Appellants, were charged in the District Court for Caroline County, with two counts of second degree assault. Appellants requested jury trials, but later waived that right and proceeded with a court trial. Trial was held on June 9, 1999, in the Circuit Court for Caroline County (Boyer, J.). Judge Boyer found Young Charles Choi guilty of two counts of assault and Daeho Michael Choi guilty of one count of assault.

Young Charles initially received probation before judgment on the first count and, on the second count, six days straight time followed by two years of supervised probation with no contact with the complainants, and a fine of $300. Young Charles declined to accept probation before judgment on the first count, and was sentenced to fifteen days, with all but six days suspended, followed by two years of supervised probation, no contact with the complainants, and a fine of $300. The sentences were to run concurrently. Daeho Michael received a sentence of fifteen days, nine of which were suspended, followed by two years of supervised probation, no contact with the complainants, and a $300 fine.

Appellants' request that the appeals be consolidated was granted.

## FACTUAL BACKGROUND

Young Charles and his brother, Daeho Michael, had a contract with the Kelley family pursuant to which the Kelleys were to grow Korean cucumbers and cabbage for them. On the morning of July 10, 1998, Appellants and their mother, Jung Choi, arrived at the Kelley farm to obtain cucumbers. What happened thereafter was the subject of some dispute.

Ryan Todd testified that he has been a paramedic for Caroline County for three years. On July 10, 1998, he responded to a 911 call for assistance at the Kelley farm. Once at the farm, Todd administered care to Andrew Kelley and Jung Choi. Todd palpated Mr. Kelley's leg, spoke to him, and found him to be conscious, alert, and oriented. According to Todd's direct testimony, Ms. Choi initially appeared to be unconscious or unresponsive. On rebuttal, Todd stated that he completed a "run sheet," which included information about the treatment he rendered to Ms. Choi. Todd indicated on the run sheet that Ms. Choi did not suffer any loss of consciousness prior to his arrival. He obtained this information from either Ms. Choi or her sons. Todd testified that Ms. Choi had a somewhat decreased level of consciousness, but he could not tell whether she had a head injury or whether she was simply being uncooperative. Todd was told that Ms. Choi was suffering from chest pain. He treated her for a possible back injury and prepared her for transport. Additional personnel arrived about 10 minutes after Todd. Todd reassessed Mr. Kelley's condition and helped to splint his leg.

Mr. Kelley's mother, 80-year-old Beatrice Kelley, identified Daeho Michael, whom she knew as "Vince," and Young Charles. She testified that on the morning of July 10, 1998, she was standing at a table next to Mr. Kelley's wife, Jane, when Young Charles spit on Jane's face. Mr. Kelley came out of a greenhouse and Young Charles went over to him and pushed him. Daeho Michael then approached Mr. Kelley and applied a "leg hook" maneuver causing Mr. Kelley to fall. Beatrice Kelley testified that Young Charles followed Jane Kelley when she went into the house to telephone for help.

Jane Kelley testified that she was standing at a table next to Beatrice Kelley planting seeds and that she saw Daeho Michael getting boxes for cucumbers. Daeho Michael looked over at Jane, asked her what she was looking at, and called her "an M.F." Jane called to her husband, who, at her request, came out of the greenhouse. She testified that Kelley told Daeho Michael not to talk to his wife that way. Then Young Charles approached and spit directly into Jane's face. She "called [her] husband to defend [her] and he came out of the greenhouse and after he spit in my face, Kelley came out and they jumped him, they jumped on him." She testified both Daeho Michael and Young Charles "had contact and they kicked [her husband] and knocked him down." She then ran into the house to call for an ambulance and the police. Young Charles ran into the house behind her and spit in her face again.

On rebuttal, Hazel Prattis, a resident of the Kelley farm, testified that she followed her sister-in-law, Jane, when she went into the house to the telephone for help. Hazel saw Young Charles follow Jane into the house and spit on Jane's face.

Kelley testified that when he heard his wife call, he came out of the greenhouse and saw Young Charles spitting on her face. He stepped between the two and, as he did, Young Charles spit on his face as well. Kelley asked Young Charles what was wrong and he responded in Korean. Young Charles then pushed Kelley. Then when Daeho Michael, whom he knew as Vincent, twisted Kelly's leg, he felt a bone come out of its socket.

Sean William Kille, of the criminal investigation division of the Caroline County Sheriff's Department, testified that, when he went to the Kelley farm, he observed Andrew Kelley lying on the ground, complaining of a leg injury, and observed Jane Kelley and the Choi brothers nearby. Ms. Jung Choi was on the ground yelling loudly and behaving in a combative manner.

Sergeant William A. Biddle of the Caroline County Sheriff's Office made observations similar to those of Mr. Kille.

Ms. Choi and Daeho Michael both testified through an interpreter. Ms. Choi testified that Jane Kelley spit on Young Charles before he spit on her. When Kelley swung his arm toward Young Charles, Ms. Choi was so upset that she "just interrupted between them." She testified that she grabbed Andrew Kelley who then kicked her knee and pushed her in the chest. She lost consciousness and fell.

Young Charles testified that Jane Kelley asked why his brother was taking some of the Kelleys' cucumber boxes. She asked him to tell his brother not to use the boxes. Young Charles responded that the boxes did not belong to the Kelleys; they were brought to the farm by the Chois. Young Charles also testified that Jane cursed at him and spit on his face. He responded by spitting on her. He claimed that his spit did not hit her. Andrew Kelley then hit Young Charles in the shoulder, face, and ear. Young Charles also testified that his mother tried to break up the fight when she stepped between him and Kelley. He denied that he hit or kicked Kelley. When his brother grabbed Kelley, he could not recall whether his brother had punched Kelley. He testified that his brother did not kick Kelley. Also, in rebuttal, Young Charles denied that he followed Jane into the house and spit in her face a second time.

Daeho Michael testified that he had been to the Kelley farm many times. On July 10,1998, he had been picking cucumbers. He was washing his legs when he heard his mother scream. He saw Andrew Kelley pushing and punching his brother, and he saw his mother trying to intervene. Kelley kicked and hit his mother. Also, he testified that his mother was knocked down and was unconscious. He ran to Kelley, wrapped his arms around Kelley's upper body and knocked him down. Daeho Michael denied kicking Kelley and said that his brother did not hit him. The translation of Daeho Michael's testimony about subsequent events is not clear. When asked what happened after he grabbed Kelley, he responded

"Andrew Kelley just laid his self down and smiled at the same time (inaudible). Why you smiling and at the same time he talked to me, you broke my leg."

## ISSUES

Appellants present two issues, which we have rephrased:

I. Whether there was sufficient evidence to support the assault convictions of Young Charles and Daeho Michael; and,

II. Whether there was sufficient evidence to support Daeho Michael's conviction for second degree assault when there was evidence that he was acting in defense of another.

## DISCUSSION

### I.

Appellants argue that the trial judge erred in relying on the evidence presented by Messrs. Todd, Kille, and Biddle because that evidence was incompetent. Appellants maintain that, absent that evidence, there was no other evidence to support their convictions.

The test for sufficiency is, after viewing all of the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Taylor v. State,* 346 Md. 452, 457, 697 A.2d 462, 464–65 (1997); *State v. Albrecht,* 336 Md. 475, 479, 649 A.2d 336, 337–38 (1994). We do not measure the weight of the evidence but only determine whether the verdict was supported by sufficient evidence, direct or circumstantial, which could fairly convince a trier of fact of the defendants' guilt of the offenses charged beyond a reasonable doubt. *Id.* When evaluating the sufficiency of the evidence in a non-jury trial, we will not set aside the court's judgment unless it was clearly erroneous. *State v. Raines,* 326 Md. 582, 589, 606 A.2d 265, 268 (1992). In making this determination, we give due regard to the trial court's finding of facts, its resolution of conflicting evidence, and its opportunity to ob-

serve and assess the credibility of witnesses. Md. Rule 8–131(c); *State v. Raines*, 326 Md. 582, 589, 606 A.2d 265, 268 (1992).

Appellants contend that the trial court "clearly indicated" that it did not believe the testimony of Beatrice, Jane, and Andrew Kelley "standing alone." They contend that all of the testimony of paramedic Todd and the two deputy sheriffs, Kille and Biddle, should have been stricken and, in any event, it failed to support the assault charges against the Appellants. They conclude that there is no credible evidence to support the verdicts.

In reaching its decision, the court recognized that there was conflicting evidence, but the court never stated that it did not believe the testimony of Beatrice, Jane, and Andrew Kelley. The court simply recognized that, but for the paramedic and deputy sheriffs, all of the witnesses were involved in family relationships. It was for this reason that the trial judge looked to the testimony of Messrs. Todd, Kille, and Biddle. The judge clearly viewed these witnesses as "impartial participants."

The court did not allow and did strike some of the testimony of Todd, Kille, and Biddle. That portion of Todd's report which contained information obtained from the deputy sheriffs was stricken as hearsay. The court did not allow information that Sergeant Kille obtained from Mr. Kelley or testimony about one of the Appellants spitting on Jane Kelley that Sergeant Kille obtained from either Andrew or Jane Kelley.

The trial court relied on other evidence resulting from the testimony of Todd, Kille, and Biddle. Statements from Andrew Kelley, which were contained in Todd's written report, about the cause of Kelley's injuries were admitted. Todd reported that Kelley "was pushed to [the] ground then kicked & stomped on by [a]ssaulters. [Mr. Kelley] fell over a pile of potting flats and said he felt/heard a 'pop' " in the area around his knee. These statements were properly admitted pursuant to Md. Rule 5–803(b)(4), which provides for the admissibility of

statements, even though the declarant is available as a witness, if the

[s]tatements [are] made for purposes of medical treatment or medical diagnosis in contemplation of treatment and [describe] medical history, or past or present symptoms, pain, or sensation, or the inception or general character of the cause or external sources thereof insofar as reasonably pertinent to treatment or diagnosis in contemplation of treatment.

■ Appellants contend that the statements contained in Todd's report which indicate that Kelley had been "kicked and stomped" were not admissible pursuant to this Rule because Todd was not a treating physician and there was no evidence that he possessed a medical degree. They rely on *Low v. State*, 119 Md.App. 413, 705 A.2d 67, *cert. denied*, 350 Md. 278, 711 A.2d 870 (1998), and argue that, according to *Low*, in order for this exception to apply, the statements must be made to a treating physician as opposed to an examining physician.

In *Low*, and in other Maryland cases discussed therein, the distinction between a treating physician and an examining physician centers on whether the medical practitioner is engaged to treat the patient or to examine the patient for the purpose of providing an expert opinion. The general rule was succinctly stated by the Court in *Maryland Department of Human Resources v. Bo Peep Day Nursery*, 317 Md. 573, 589–90, 565 A.2d 1015, 1023 (1989):

Under the law of evidence, as a general proposition, statements of medical history, made by a patient to a treating medical practitioner for the purpose of treatment, may be admitted as substantive evidence through the medical witness. If the medical practitioner is engaged only to render an expert opinion, and not for purposes of treatment, statements of history related by the patient are admissible through that witness for the limited purpose of explaining the basis for the expert's opinion.

[5] Neither *Low,* nor *Bo Peep Day Nursery,* nor any other Maryland case, specifically requires that the witness be a treating physician holding a medical degree in order for the exception to apply. As the Court of Appeals explained:

Statements by a patient to a physician consulted for diagnosis and treatment are admissible under the theory that someone who goes to a doctor for diagnosis and treatment is not going to supply false information. Statements made by the person who brought the patient to the treating physician should also be received into evidence when the foundational facts show that the declarant has first hand knowledge and that the declarant's motive to provide accurate, complete, and truthful information is identical to that of the patient.

*Yellow Cab Co. v. Henderson,* 183 Md. 546, 551–54, 39 A.2d 546, 550 (1944).

[6] We relied on this reasoning in *In re Rachel T.,* 77 Md.App. 20, 549 A.2d 27 (1988), which involved allegations of severe sexual abuse of a child, and held that statements made to a social worker by the young child were admissible under the medical treatment and diagnosis exception to the hearsay rule. In *In re Rachel T.,* because the treating physician had been unsuccessful in eliciting information from the child, he requested a specially trained social worker to interview the child as part of an interdisciplinary team method. The child made statements to the social worker which indicated her father had severely sexually abused her. We held that the child's statements to the social worker were related to medical treatment and were an important part of the medical history to be relied upon by the treating physician. We recognized that the child "knew that her statements would be used to provide appropriate treatment." *In re Rachel T.,* 77 Md.App. at 35, 549 A.2d 27. *See also* Lynn McLain, 6 *Maryland Evidence, State and Federal,* § 803(4), p. 368 (1987)("The Maryland cases concern only statements made to physicians. But the rationale for the hearsay exception extends to statements made in seeking medical treatment from others such as nurses, orderlies, and parents."); *Sullivan v. United States,* 404 A.2d 153, 158–59 (D.C.App.1979)(under Federal Rule of

Evidence 803, from which Maryland's rule was enacted, the medical diagnosis exception to the hearsay rule applies to statements made to hospital attendants, ambulance drivers, and not just physicians). When a Federal rule of evidence contains the same language as a Maryland rule, a court may look to the former when interpreting the latter. Interpretations of the Federal rule are persuasive as to the meaning and proper applications of the Maryland rule. *See Philip Morris, Inc. v. Angeletti,* 358 Md. 689, 752 A.2d 200, 219 (2000) (and cases cited therein).

Todd was dispatched to the Kelley farm to provide medical assistance, which included initial diagnoses and treatment of any injuries. He acquired information in order to diagnose and treat medical conditions. Kelley was injured and in need of medical assistance. He had a strong incentive to supply truthful information to Todd, a paramedic. Those portions of Todd's report that indicated Mr. Kelley was "kicked and stomped" were the bases of the cause of Mr. Kelley's pain and medical condition, and properly admitted in evidence pursuant to Rule 5–803(b)(4).

■ Appellants also contend that the testimony offered by Todd, Kille, and Biddle did not support the Kelleys' version of the encounters. The trial judge relied upon the observations and information gathered at the scene by the paramedic and the deputy sheriffs in finding that the Kelleys' and Prattis' versions of the actions of the parties were what had occurred. We defer to the trial court's findings of fact, as well as its resolution of conflicting evidence, and its opportunity to observe and assess the credibility of the witnesses.

There was other evidence which supported the trial court's finding that Young Charles assaulted Andrew Kelley by hitting him and assaulted Jane Kelley by spitting on her. There was also other evidence to support the trial court's finding that Daeho Michael grabbed Kelley and forced him to the ground. Most convincing was the evidence provided by the Choi family. Although Young Charles claimed that Jane Kelley spit on him first, he admitted he spit at her. The

following exchange occurred between the prosecuting attorney and Young Charles:

Q. Well, let me ask you this. You're saying Andrew hit you, in response to Ms. Kelley spitting on you, did you do anything to her?

A. [Interpreter for Young Charles Choi]: I responded to spit on her.

Q. You spit back on her?

A. [Mr. Choi]: Right.

Q. Where did you spit on her?

A. [Interpreter]: It was just a little bit spat but I tried to spit on her but it didn't hit.

Q. She spit on you, you spit on her?

A. [Mr. Choi]: Yes.

Young Charles's mother, Jung Choi, testified:

Q. Did your son prior to Ms. Kelley spitting, did your son spit on her first?

[Ms. Choi]: No.

Q. So you saw Ms. Kelley spit in your son's face?

A. Yes, yes, I did.

Q. Then what happened?

A. (Unintelligible) my son was responding and spat on her.

Q. So his response to being spit on was he spit back?

A. Yes.

This confirms, in part, the testimony of Jane, Andrew, and Beatrice Kelley and Hazel Prattis. During closing argument defense counsel admitted "that Young Choi did spit in Jane Kelley's face."

Young Charles's testimony confirmed that Daeho Michael assaulted Andrew Kelley by grabbing him and forcing him to the ground:

Q. Andrew Kelley pushes your mother to the ground, then what happens?

A. [Interpreter]: My brother was distance about twenty (20) feet.

Q.  How many feet?

A.  [Mr. Choi]: Six (6) meter.  [Interpreter]: Six (6) meter.

Q.  Okay.

A.  [Interpreter]: He went over and then grabbed Andrew Kelley.

Q.  How did he grab Andrew Kelley?

A.  [Interpreter]: And he just ran over Andrew Kelley and (inaudible) Andrew Kelley just fell down.

\* \* \*

Q.  Describe to the Court what exactly you saw your brother do?

\* \* \*

A.  [Interpreter]: He just ran over toward Mr. Kelley and Mr. Kelley fell down.

Q.  Well, your brother ran over to Mr. Kelley, Mr. Kelley fell down, but there has to be something that happened in between that point between your brother and Mr. Kelley that Mr. Kelley fell down, what exactly did you see?

A.  [Interpreter]: (Inaudible) by the pressure, he just ran over (inaudible) kind of pressure Andrew Kelley was fell down.

Q.  What kind of pressure?

A.  [Mr. Choi]: I'm going to say in English.  All right, a running force, because of running force, he fell down.

Q.  Did your brother push him?

A.  [Mr. Choi]: Right down.

Q.  Hold it, what did you just say?

A.  [Interpreter]: My brother just ran over toward him and he grabbed and the force.

Q.  Did your brother grab Mr. Kelley?

A.  [Interpreter]: Yes.

Q.  How did he grab Mr. Kelley?

A.  [Interpreter]: (Inaudible) ran over and then grabbed.

Q. Are you familiar with the phrase bear hug?

A. [Mr. Choi]: Bear ... no.

Q. Did he wrap his arms around from the back to the front?

A. [Interpreter]: Nothing a polar bear, just a (inaudible) and he grabbed.

Q. Were Mr. Kelley's arms inside your brother's grab or outside your brother's grab?

A. [Interpreter]: My brother grabbed hold of Mr. Andrew Kelley's arm sideways.

On cross-examination, young Charles testified:

Q. You indicated that Daeho Choi put Mr. Kelley down on the ground, is that right?

A. [Interpreter for Young Charles Choi]: That is correct.

Q. And he did not do that with a leg whip?

A. [Interpreter]: As far as I remember (inaudible).

Q. How did he put him down on the ground?

A. [Interpreter]: What I just remembered, my brother ran over toward him and (inaudible) grabbed. [Mr. Choi]: Running push. [Interpreter]: And so (inaudible) force that Andrew Kelley just knocked down on the ground.

After he stated that he saw Andrew Kelley kick and hit his mother, Daeho Michael testified:

Q. What did you do?

A. [Interpreter]: I just ran (inaudible) and grabbed.

Q. How did you grab it?

A. [Interpreter]: Same time just run, ran over and (unintelligible) at the same time.

Q. You didn't answer the question. How did you grab him? How did your arm go around his body?

A. [Interpreter]: By the force and just ran over toward him and then grabbed.

Q. You still didn't answer the question. How did your arm touch his body?

A. [Interpreter]: I tried to grab a hold his arm, the shoulder but I couldn't not reach for the arm.

Q. All right, your arm went around his upper body?

A. [Interpreter]: Yes, that is correct.

During closing argument, defense counsel admitted that Daeho Michael "grabbed Mr. Kelley and put him to the ground."

All of the Choi family testified that Young Charles never hit Andrew Kelley; however, Beatrice Kelley testified that as Andrew Kelley was coming out of the greenhouse, Young Charles approached him and pushed him. Also, Jane Kelley testified that as Andrew Kelley was coming out of the greenhouse, both Young Charles and Daeho Michael kicked him and knocked him down. Kelley testified that Young Charles pushed him. Resolution of conflicts in the evidence are within the sound discretion of the trial court, *supra*. We see no reason to disturb the trial court's findings.

## II.

Daeho Michael contends that the trial court erred in finding him guilty of second degree assault because he was acting in the defense of his mother. Defense of another is a recognized response to a second degree assault charge if: (1) the defendant actually believed that the person defended was in immediate and imminent danger of death or serious bodily harm; (2) the defendant's belief was reasonable; (3) the defendant used no more force than was reasonably necessary to defend the person defended in light of the threatened or actual force; and, (4) the defendant's purpose in using force was to aid the person defended. *Williams v. State*, 117 Md.App. 55, 63, 699 A.2d 473, 477 (1997). The intervention must be to aid the victim and not to punish the offender or to avenge the victim. *Alexander v. State*, 52 Md.App. 171, 184, 447 A.2d 880, 887, *aff'd* 294 Md. 600, 451 A.2d 664 (1982). The intervenor's acts "must be judged on his own conduct, based upon his own observation of the circumstances as they reasonably appeared to him." *Bright v. State*, 68 Md.App. 41, 50, 509 A.2d 1227, 1232 (1986)(citing *Alexander v. State*, 52 Md.

App. 171, 183, 447 A.2d 880, *aff'd,* 294 Md. 600, 451 A.2d 664 (1982)).

In the case *sub judice,* the trial court found it admirable that Daeho Michael Choi acted to protect his mother, but concluded that he was guilty of assault because he overreacted. The evidence supports the court's finding that, in assaulting Andrew Kelley, Daeho Michael used more force than was reasonably necessary.

**JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANTS.**